IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ERIC D. PERRY,

            Petitioner,               No. CIV S-03-1681 FCD GGH P

   vs.

TOM CAREY, Warden,               <u>FINDINGS & RECOMMENDATIONS</u>

            Respondent.

_____/

I. <u>INTRODUCTION</u>

         Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus.  Petitioner challenges his November 28, 2001 conviction for first degree burglary, assault with a firearm, making terrorist threats, and false imprisonment by violence, with firearm enhancements on the burglary and false imprisonment counts.  On January 15, 2002, petitioner was sentenced to a seven-year term of imprisonment.  He was released on parole May 21, 2005.

         This action is proceeding on the Amended Petition filed September 14, 2004.[1] Petitioner asserts six grounds for relief:  1) insufficient evidence to support petitioner's burglary conviction; 2) failure to disqualify the trial judge; 3) ineffective assistance of counsel;

---

[1] <u>See</u> Order of this court, filed October 5, 2004, so designating the "Amended Petition."

4) failure to exclude petitioner's pre-Miranda statements to law enforcement because obtained

pursuant to custodial interrogation without admonition; 5) failure to exclude all of petitioner's

statements to law enforcement because involuntarily made; and 6) error in reading jury

instruction CALJIC No. 17.41.1.

After carefully considering the record, the court recommends that the petition be

denied.

II.  ANTI-TERRORISM AND EFFECTIVE DEATH PENALTY ACT (AEDPA)

The AEDPA "worked substantial changes to the law of habeas corpus,"

establishing more deferential standards of review to be used by a federal habeas court in

assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

between "contrary to" clearly established law as enunciated by the Supreme Court, and an

"unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

Court on a point of law, or (2) if the state court case is materially indistinguishable from a

Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to

mixed questions of law and fact, that is, the application of law to fact where there are no factually

on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

AEDPA standard of review which directs deference to be paid to state court decisions.  While the

deference is not blindly automatic, "the most important point is that an *unreasonable* application

of federal law is different from an incorrect application of law....[A] federal habeas court may not

1   issue the writ simply because that court concludes in its independent judgment that the relevant

2   state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

3   that application must also be unreasonable." <u>Williams (Terry)</u>, 529 U.S. at 410-11, 120 S. Ct. at

4   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

5   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

6   authority.  <u>Woodford v. Viscotti</u>, 537 U.S. 19, 123 S. Ct. 357 (2002).

7           The state courts need not have cited to federal authority, or even have indicated

8   awareness of federal authority in arriving at their decision.  <u>Early v. Packer</u>, 537 U.S. 3, 123 S.

9   Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

10  contrary to, or an unreasonable application of, established Supreme Court authority.  <u>Id</u>.  An

11  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

12  occurred.  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

13  established Supreme Court authority reviewed must be a pronouncement on constitutional

14  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

15  binding only on federal courts.  <u>Early v. Packer</u>, 123 S. Ct. at 366.

16          However, where the state courts have not addressed the constitutional issue in

17  dispute in any reasoned opinion, the federal court will independently review the record in

18  adjudication of that issue.  "Independent review of the record is not de novo review of the

19  constitutional issue, but rather, the only method by which we can determine whether a silent state

20  court decision is objectively unreasonable." <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir.

21  2003).

22          In reviewing a state court's summary denial of a habeas petition, the court "looks

23  through" the summary disposition to the last reasoned decision.  <u>Shackleford v. Hubbard</u>, 234

24  F.3d 1072, 1079, n. 2 (9th Cir. 2000) (citing <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04, 111

25  S.Ct. 2590 (1991)).

26  \\\\\

1    In the instant case, the California Supreme Court issued a summary denial of

2 petitioner's habeas petition on all six claims.  However, only three of these claims were

3 previously analyzed by the Court of Appeal on direct appeal (and summarily denied, along with

4 petitioner's then newly raised claims, by the Supreme Court pursuant to petitioner's petition to

5 review).

6    Accordingly, the court conducts an independent review of the record, albeit under

7 AEDPA standards, to analyze petitioner's claims 1,2 and 3, and looks through to the reasoned

8 decision of the California Court of Appeal to analyze petitioner's claims 4, 5 and 6.

9 III.  <u>BACKGROUND</u>

10    On November 28, 2001, petitioner was convicted of first degree residential

11 burglary (Cal. Penal Code § 459), assault with a firearm (Cal. Penal Code § 245(a)(2)), making

12 terrorist threats (Cal. Penal Code § 422), and false imprisonment by violence (Cal. Penal Code §

13 236); firearm enhancements pursuant to Cal. Penal Code § 12022(a) were found on the burglary

14 and false imprisonment counts.  Clerk's Transcript on Appeal (Exh. A to Answer) (hereafter

15 "CT") at 330, 298.

16    On January 15, 2002, petitioner was sentenced to seven years imprisonment based

17 on application of the high term for a first degree burglary conviction (six years) (see Cal. Penal

18 Code § 461(a)), plus one year enhancement for use of a firearm (<u>id</u>., § 12022(a)(1)).  CT at 327-

19 31.

20    On April 29, 2003, the California Court of Appeal for the First District (Division

21 Three) issued an unpublished opinion affirming the trial court's judgment in its entirety.  Exh. I

22 to Answer (hereafter "Opinion").  The California Supreme Court summarily denied review on

23 July 9, 2003.  Exh. D to Respondent's October 28, 2003 Motion to Dismiss .[2]

24 \\\\\

25 _____

26    [2]  Respondent states that this document is contained in Exhibit J to its Answer, but it is
not.

4

1          On August 11, 2003, petitioner filed in this court his initial petition for writ of

2   habeas corpus.  Subsequent to the court's rulings on respondent's motion to dismiss and

3   petitioner's motion to stay, petitioner demonstrated exhaustion of all claims pursuant to the

4   California Supreme Court's denial of the writ petition on September 1, 2004.  See Exh. K to

5   Answer, and Notice of Supreme Court's September 1, 2004 Denial of Habeas Petition and

6   attached exhibits filed in this court October 13, 2004.  This court then construed petitioner's

7   September 14, 2004 filing as his amended petition demonstrating exhaustion of all claims, and

8   directed service upon respondent.  See Order of this Court filed October 5, 2004.  Respondent

9   answered the amended petition (hereafter "Petition") on February 7, 2005, and petitioner filed a

10  traverse on March 8, 2005.

11          Petitioner was released on parole on May 21, 2005.  See Notice of Change of

12  Address filed May 3, 2005.

13          The opinion of the California Court of Appeal contains a factual summary.  After

14  independently reviewing the record, the court finds this summary to be accurate and adopts it as

15  follows (Opinion at 1-3) (fn. omitted):

16      Eighteen-year-old Tracy Pruitt lived in a house with her mother and her boyfriend,
        Sean Woods.  Joe Finocchio and Chris Carillo also rented rooms in the house.

17      Late in the night on June 29, 2000, Pruitt was awakened from her sleep by a
        woman hitting her in the face.  The woman asked Pruitt where Pruitt's boyfriend

18      was; when Pruitt said she did not know, the woman continued hitting her in the
        head and face.  Meanwhile, two White males kicked in the door to Carillo's

19      bedroom, but Carillo fled by jumping through a window into the backyard.  The
        men, one of whom Pruitt recognized as Finocchio, then entered Pruitt's room.

20      One smashed Pruitt's furniture and belongings with a baseball bat, while the other
        pointed a shotgun at Pruitt.  The woman and two men imprisoned Pruitt in her

21      bedroom and assaulted her for several hours.  They poured motor oil on her head,
        cut off her waist-length hair with a steak knife, and threatened to burn her nipples

22      off with a spoon they had heated with a blowtorch.  Pruitt was ordered not to look
        around.  Each time she glanced at her assailants, the woman struck her.

23
        A Black man was also present with the two White males and female, although he
24      did not participate in the assaults or hold the weapon.  Pruitt did not get a good
        look at him and could not identify him as defendant Perry.  At one point, near the
25      end of the incident, the woman told Pruitt to stay on her bed and everyone except
        the Black man left.  The man allowed her to go to the bathroom, and he brought
26      her a drink of water.  However, he threatened Pruitt that someone would "come

5

1    after" her if he went to jail "over this."

2    While investigating the case, Vacaville police officer Joe Curtis learned that a
     man named "'Eric'" might have information.  Curtis went to the address he was
3    given and, while he was looking at one of the houses, Perry walked down his
     driveway.  Detective Curtis (who was in uniform) rolled down the window of his
4    unmarked police cruiser and asked "'Are you Eric?'" Perry responded, "'I was
     there.  I knew you were coming.'" Perry agreed to come to the Vacaville police
5    station and give a statement.

6    During a videotaped interview, Perry admitted he was at Pruitt's house but denied
     participating in the assault.  Perry said he had been friends with Finocchio for a
7    long time, and he went to the house to help Finocchio move his things.  Finocchio
     wanted to move because his safe had been stolen.  On the way, they picked up
8    Finocchio's girlfriend Louise and two White men.  Perry admitted the group
     picked up a shotgun from Louise's house, but he denied carrying it.  He held a
9    taser gun when the group first broke into Carillo's room.  Perry said he was drunk
     and did not know what the others were doing in Pruitt's house.  He ate some pizza
10   in the kitchen and may have given the others a knife when they talked about
     wanting a knife to cut Pruitt's hair.  He denied watching the assault, but he
11   acknowledged learning the others had gotten information out of Pruitt regarding
     the theft of the safe.  Perry said he stayed at the house, watching Pruitt so she
12   would not run away, until after 10:00 the next morning.

13   Perry was charged with burglary, assault with a deadly weapon, assault with a
     firearm, terrorist threats, false imprisonment and vandalism.  At trial, Perry called
14   the police officer who had interviewed Pruitt immediately after the incident.
     Pruitt told him Finocchio poured motor oil on her and cut off her hair, and she did
15   not mention that a Black male was involved.  Louise Tyo, Finocchio's girlfriend,
     also testified for the defense.  She had pleaded guilty to burglary and felony
16   assault in connection with the incident.  Tyo testified Perry went to the house but
     did nothing except make a pizza and feed the dog.

17
     The jury found Perry not guilty of assault with a deadly weapon or vandalism, but
18   found him guilty of burglary, assault with a firearm, terrorist threats and false
     imprisonment.  The jury also found true allegations that Perry committed the
19   burglary and false imprisonment while armed with a firearm; however, the jury
     found not true an allegation that he made terrorist threats while so armed.  Perry
20   was sentenced to seven years imprisonment.

21   IV.  DISCUSSION

22        A.  SUFFICIENCY OF EVIDENCE TO SUPPORT BURGLARY CONVICTION

23        Petitioner contends his first degree burglary conviction should be reversed

24   because the evidence was insufficient to sustain a finding petitioner entered the victim's home

25   with the intent to steal.

26   \\\\\

                                              6

1    "Under clearly established Supreme Court case law, due process requires that 'no

2    person shall be made to suffer the onus of a criminal conviction except upon sufficient proof –

3    defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the

4    existence of every element of the offense.'  To determine whether this due process right has been

5    violated, the appropriate inquiry before the passage of AEDPA was a straightforward question of

6    'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational

7    trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"

8    Sarausad  v. Porter, 479 F.3d 671, 677 (9th Cir. 2007), quoting Jackson v. Virginia, 443 U.S.

9    307, 316, 319 (1979) (original emphasis).  Pursuant to AEDPA, the Ninth Circuit relies on §

10   2254(d)(1) to evaluate a state court's sufficiency-of-the-evidence determination under Jackson.

11   Sarausad, 479 F.3d at 677, citing Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir.2005) (as

12   amended).[10]  "Under 28 U.S.C. § 2254(d)(1), we inquire whether a state court determination that

13   the evidence was sufficient to support a conviction was an 'objectively unreasonable' application

14   of Jackson."  Sarausad, 479 F.3d at 677.  The test is whether the appellate court's conclusion is

15   reasonable, viewed in the light most favorable to the prosecution.

16   "The Jackson standard 'must be applied with explicit reference to the substantive

17   elements of the criminal offense as defined by state law.'"  Sarausad, 479 F.3d at 678, quoting

18   Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004) (en banc) (internal quotation marks

19   omitted).  This analysis permits the determination that "circumstantial evidence and inferences

20   drawn from the record may be sufficient to sustain a conviction.  However, mere suspicion or

21   speculation cannot be the basis for creation of logical inferences.  Where behavior is consistent

22   with both guilt and innocence, the burden is on the State to produce evidence that would allow a

23   rational trier of fact to conclude beyond a reasonable doubt that the behavior was consistent with

24

---

25   [10]  Because "§ 2254(d)(2) is not readily applicable to Jackson cases," the Ninth Circuit
     evaluates "a state court's resolution of a Jackson sufficiency-of-the-evidence claim" under only §
26   2254(d)(1).  Sarausad, 479 F.3d at 677-78.

1   guilt.  However, the prosecution need not affirmatively rule out every hypothesis except that of

2   guilt.  A jury's credibility determinations are entitled to near-total deference under Jackson."

3   Sarausad, 479 F.3d at 2007 at 678 (citations and internal quotations omitted).

4              California Penal Code section 459 defines burglary as a person's entry of a room,

5   house or other dwelling "with intent to commit grand or petit larceny or *any felony*."  (Emphasis

6   added.)  Although petitioner acknowledges that intent to commit *any* felony can support a

7   burglary conviction, his argument is limited to the contention there is no evidence to support a

8   finding petitioner harbored *larcenous* intent when he entered Pruitt's house.  Rather, argues

9   petitioner, he entered the house with the sole intent of assisting Finocchio retrieve his safe.  Since

10  Finocchio resided at the Pruitt house, argues petitioner, there was not even a trespass.  Petitioner

11  emphasizes that he spent eight hours at the house without taking any property; rather, as

12  codefendant Louise Tyo testified (Reporter's Transcript on Appeal (Exh. D (Vol. 2) to Answer

13  (hereafter "RT") at 149), petitioner only fed the dog and made a pizza (which petitioner claims

14  belonged to Finocchio).

15             The jury was instructed on the general language of Cal. Penal Code section 149

16  with reference to the other felonies charged in this case, specifically (RT at 240-241):

17             Every person who enters any building or room with the specific intent to commit
            an assault with a deadly weapon or instrument, assault with a firearm, terrorist
18             threats, false imprisonment by violence or felony vandalism is guilty of the crime
            of burglary in violation of Penal Code section 459.
19

20  The jury found – and petitioner does not challenges these findings – sufficient evidence to

21  convict petitioner on charges of assault with a firearm, making terrorist threats, and false

22  imprisonment by violence.  These findings, resting in part on petitioner's own statements to law

23  enforcement (properly admitted, as discussed infra), support the conclusion that petitioner

24  formed the intent to commit one or more of these felonies before entering the Pruitt house and/or

25  the Pruitt or Carillo bedrooms.  It is reasonable to conclude, for example, that petitioner harbored

26  the requisite intent for assault with a firearm and false imprisonment when he acted as the

8

1   "muscle" by holding a taser gun while the other defendants kicked open Carillo's bedroom door,

2   entered his room, and hit and chased Carillo with a bat.  Exh. E to Answer, at 28, 32-36.  The

3   record is replete with such factual scenarios pursuant to which the jury may reasonably have

4   inferred petitioner harbored the requisite felonious intent to support his burglary conviction.

5          Petitioner's reliance on People v. Salemme, 2 Cal. App. 4th 775 (1992), is

6   misplaced.  Salemme held that the intent to commit any felony when entering an enumerated

7   structure will support a burglary conviction except when the individual has an unconditional

8   possessory right to enter as an occupant of the structure, or is invited in by the occupant who

9   knows and endorses the entrant's felonious intent.  Salemme involved the general entry of a

10  home, not of separate private bedrooms.  Cf., e.g., People v. Sparks, 28 Cal. 4th 71 (2002)

11  (burglary includes entry into victim's bedroom with felonious intent).  Although he resided at the

12  Pruitt home, Finnochio was not an occupant of the Carillo or Pruitt bedrooms; nor can it be said

13  that Carillo or Pruitt invited defendants into their rooms and authorized the felonious conduct

14  therein.

15         The evidence of record, as presented to the jury and viewed in the light most

16  favorable to the prosecution, was sufficient to support petitioner's conviction on the burglary

17  charge.  Accordingly, petitioner is not entitled to relief based upon his claim the evidence was

18  insufficient to support his burglary conviction.

19      B. DENIAL OF MOTION TO DISQUALIFY TRIAL JUDGE

20         Petitioner contends he was denied due process by the trial court's denial of his

21  motion to disqualify the trial judge pursuant to Cal. Civil Proc. § 170.6 [sic].  Respondent asserts

22  this claim at no time alleged federal constitutional error and is therefore not exhausted.

23         On September 28, 2001, petitioner's interim counsel (Tom Healy) filed a

24  peremptory challenge pursuant to Cal. Civil Proc. § 170.6 seeking disqualification of the trial

25  judge, the Honorable Harry S. Kinnicutt.  CT at 53.  Judge Kinnicutt denied the challenge as

26  untimely on October 2, 2001.  CT at 54.

On November 1, 2001, petitioner's trial counsel (Robert Fracchia) filed a motion to disqualify Judge Kinnicutt, entitled "Verified Statement of Disqualification," asserting the trial judge was biased within the meaning of former Cal. Civil. Proc. § 170.1(a)(6)(C) ("A judge shall be disqualified if . . . a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial").[11]  CT at 63-73.  The Statement and supporting documentation provide that on September 9, 2001, petitioner's mother filed a Citizen's Complaint with the Solano County Sheriff's Department against Deputy Sheriff Lawrence W. Stacks, Judge Kinnicutt's bailiff.  The complaint recounts an incident commencing in Judge Kinnicutt's courtroom on August 28, 2001, wherein Deputy Stacks allegedly used unreasonable force against petitioner,[12] and asserts that "[n]either defendant Perry nor his mother, Mary Perry, feel that defendant can receive a fair and impartial trial in light of the incident . . ."  CT at 64.

The August 28, 2001 incident originated in court proceedings commenced pursuant to the motion of original defense counsel, John Coffer, for a continuance to accommodate his litigation  schedule.  CT at 32-37; Exh. D (Vol. 1) to Answer (Aug. 28, 2001 hearing), at 7-10.  At the hearing, defense counsel introduced the "more pressing" issue of

---

[11]  This statute was amended in 2005 and now provides the same wording at Cal. Civil Proc. § 170.1(a)(6)(A)(iii).

[12]  The complaint states in full (CT at 69):

> I am writing this letter because of an incident that happen[ed] in the Court Room, regarding Eric Perry.  The excessive action of the Bailiff L. Stacks #209 was uncalled for.  Eric did use profanity because the lawyer was trying to get him to take a plea for 4 yrs. for a crime he did not do.  At that point the bailiff took upon his judgment to react the way he did and violently abusing [sic] Eric Perry while he was handcuffed and shackled.  The bailiff grab[b]ed him[,] slammed him against a wall[,] pulled him by the chain[,] threw him in the elevator hitting his head on the elevator.  He has a lump about the size of a golf ball on his head, his neck was jammed, his arm was cut.  I hope there will be dis[ci]plinary action against this type of behavior.  No human being should be treated this way black or white should be treated this way [sic].  I am enclosing a copy of the newspaper article [not provided in this proceeding].  I am referring this to a lawyer for advice.  I'm also filing a complaint to the NAACP.  This was upsetting to me seeing your son treated like that.  I guess its true that black people are treated unfairly in Solano County.

petitioner's competency to stand trial, and stated that this matter had led to a conflict between

counsel and petitioner "which raises a doubt whether I can continue to represent him." Id. at 7-8.

The court suspended proceedings pending a determination of petitioner's competency, despite

petitioner's statements to the court.  Petitioner disputed his need to be assessed (stating he had

already had two assessments at the beginning of the year and accusing his attorney of "messing

with my mind" and "playing with me"); sought to explain that he was supposed to get "a deal"

before his original trial date but "they never gave me a deal;" and stated that his counsel had then

tried to force him into taking an unfair deal and "I would like to fire him.  I do not wish him to

represent me no more."  Id. at 8-9.  When Judge Kinnicutt explained that "we can discuss all that

after we receive those reports and you're returned to competency," petitioner asked, "Why are

you all playing with me?"  Id. at 9.  Apparently in response to the bailiff's action, petitioner

stated, "You ain't gotta grab me like this," followed by several expletives.  Id.

        In addition to this incident,[13] petitioner asserts the judge "has a reputation of being

_____

[13]  Petitioner has sought further to inform the court of this incident by submitting new evidence with his traverse.  This evidence includes:  (1) a letter written by Finocchio stating that "During the summer of 2001, while in a holding cell at the court house, I witnessed Officer Stacks push/shove Eric into the elevator.  Immediately following the push/shove, I heard a loud crash and inferred that it was Eric's body slamming into the wall."  Docket, Doc. # 34 (Decl. of Joseph Finnochio); (2) (a) an undated complaint to the State Bar against attorney John Coffer completed by petitioner; (b) a Fairfield Daily Republic newspaper article that provides in part: "After voicing his concern to the judge, Perry behaved badly and ended up being directed into a courtroom wall by an unhappy bailiff.  The clanking echo of Perry's body bouncing off a cell wall was heard a few seconds later as Perry continued to loudly express his discontent in a secured holding area next to the courtroom;" (c) a second Fairfield Daily Republic newspaper article headlined "'Minimal' role in crime earns man seven years;" (d) a Vacaville Police Department "Information Report" dated June 28, 2000, inquiring whether Carillo could identify petitioner in a line-up and noting, "At this time there is no further information available to corroborate [petitioner]s] involvement in this case;" and (e) a transcript of the August 28, 2001 proceedings.  Docket, # 36 ("Notice of Lodging Exhibits with the Court"); (3) (a) Interdepartmental notifications of detention; and (b) a transcript of October 4, 2001 proceedings in another of petitioner's cases before the Honorable Ramona J. Garrett, noting a finding of competency and reinstatement of criminal proceedings.  Docket, Doc. #38 ("Notice of Lodging Exhibits with the Court Correction").  These materials, most of which generally support, or are duplicative of, record evidence, are unnecessary to determine the merits of the petition; accordingly, they shall not be admitted to expand the record.  See Rule 7 of the Rules Governing Habeas Corpus Cases.

1  unfair and prejudice [sic] to minorities." Petition, at p. 11.  Petitioner explains, "An example is

2  that a white defendant received one year county jail for [an] ounce of cocaine and the black

3  defendant had 3 cocaine base rocks and received 3 years State Prison." Id.

4          Judge Kinnicutt filed a verified answer on November 1, 2001, asserting lack of

5  information regarding the alleged incident and that he was neither biased nor prejudiced against

6  petitioner or his counsel.  CT at 74-77.

7          On November 5, 2001, the matter was referred for consideration before a neutral

8  hearing officer.  CT at 78.  Petitioner's supporting memorandum was filed on November 9, 2001.

9  CT at 80-86.  Petitioner argued that the standard mandates disqualification upon only the

10 appearance of partiality, and that "[c]learly an average citizen might reasonably conclude that a

11 judge who was present at the start of an incident in this courtroom which resulted in a citizen's

12 complaint against the bailiff assigned to his courtroom may not be impartial."  CT at 83.  On

13 November 20, 2001, the Honorable Kenneth Kingsberry denied petitioner's motion without

14 hearing, CT at 119-120, on the ground that "there has not been sufficient facts shown by the

15 factual scenario described to warrant a person aware of the facts to reasonably entertain a doubt

16 that the judge would be able to be impartial," CT at 120.

17         Respondent contends petitioner failed to "fairly present" alleged federal

18 constitutional error below and his claim is therefore not exhausted.[14]

19         The claim should be dismissed, but not primarily on exhaustion grounds.  The

20 Amended Petition filed on August 11, 2003, simply reprints the briefing filed in state court

21

22         [14] "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available
   state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the opportunity to pass upon and
23 correct alleged violations of its prisoners' federal rights.'" Duncan v. Henry, 513 U.S. 364, 365,
   115 S.Ct. 887 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509
24 (1971). To provide the State with the necessary "opportunity," the prisoner must "fairly present"
   his claim in each appropriate state court (including a state supreme court with powers of
25 discretionary review), thereby alerting that court to the federal nature of the claim.  Duncan,
   supra, at 365-366; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728 (1999)." Baldwin
26 v. Reese  541 U.S. 27, 29, 124 S. Ct. 1347, 1349 (2004) (internal quotations omitted).

1   raising a state court issue.  It is axiomatic that federal habeas corpus is reserved for those claims

2   asserting violations of federal constitutional law or other federal law applicable to the states.

3   Estelle v. McGuire, 502 U.S. 62, 67 112 S.Ct. 475, 480 (1991).  Nor could this court reach out

4   and decide a federal issue which it deemed similar to the state issue raised.  In order for the

5   federal claim to be exhausted, it is insufficient that petitioner raised a similar state claim with

6   similar standards – the federal claim *must* have been *expressly* raised in state court.  Duncan v.

7   Henry, 513 U.S. at 366, 115 S. Ct. at 888.  In sum, no express or implied federal claim may exist

8   concerning petitioner's judge bias concerns.

9       C.  ASSISTANCE OF TRIAL COUNSEL

10           Petitioner contends his representation by trial counsel was constitutionally

11   defective because counsel failed to:  (1)  present a defense that petitioner lacked the requisite

12   felonious intent to commit burglary; (2) present mitigating evidence at sentencing; (3) obtain a

13   plea agreement offered by the prosecution; (4) present defense testimony; and (5) impeach the

14   testimony of the principal prosecution witness.  The third contention challenges the actions of

15   pretrial counsel John Coffer; the remainder challenge petitioner's trial representation by Robert

16   Fracchia.

17           The test for demonstrating ineffective assistance of counsel is set forth in

18   Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984).  First, a petitioner must show

19   that, considering all the circumstances, counsel's performance fell below an objective standard of

20   reasonableness.  Strickland, 466 U.S. at 688.  To this end, the petitioner must identify the acts or

21   omissions that are alleged not to have been the result of reasonable professional judgment.  Id. at

22   690. The federal court must then determine whether in light of all the circumstances, the

23   identified acts or omissions were outside the wide range of professionally competent assistance.

24   Id.  "We strongly presume that counsel's conduct was within the wide range of reasonable

25   assistance, and that he exercised acceptable professional judgment in all significant decisions

26   made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir.1990) (citing Strickland at 466 U.S. at 689).

1    Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

2    693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

3    unprofessional errors, the result of the proceeding would have been different.  A reasonable

4    probability is a probability sufficient to undermine confidence in the outcome." Id.

5    In extraordinary cases, ineffective assistance of counsel claims are evaluated

6    based on a fundamental fairness standard.  Williams v. Taylor, supra, 529 U.S. at 391-93 (citing

7    Lockhart v. Fretwell, 506 U.S. 364, 113 S.Ct. 838 (1993)).

8    The Supreme Court recently emphasized the importance of giving deference to

9    trial counsel's decisions, especially in the AEDPA context (Bell v. Cone, 535 U.S. 685, 698-699,

10   122 S. Ct. 1843, 1852 (2002)):

11   In Strickland we said that "[j]udicial scrutiny of a counsel's performance must be
     highly deferential" and that "every effort [must] be made to eliminate the
12   distorting effects of hindsight, to reconstruct the circumstances of counsel's
     challenged conduct, and to evaluate the conduct from counsel's perspective at the
13   time." 466 U.S., at 689, 104 S. Ct. 2052 []. Thus, even when a court is presented
     with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a
14   [petitioner] must overcome the "presumption that, under the circumstances, the
     challenged action 'might be considered sound trial strategy.' " Ibid. (quoting
15   Michel v. Louisiana, 350 U.S. 91, 101, 76 S. Ct. 158 [] (1955)).

16   For [petitioner] to succeed, however, he must do more than show that he would
     have satisfied Strickland's test if his claim were being analyzed in the first
17   instance, because under § 2254(d)(1), it is not enough to convince a federal habeas
     court that, in its independent judgment, the state-court decision applied Strickland
18   incorrectly. See Williams, supra, at 411, 65 S. Ct. 363 []. Rather, he must show
     that the [ ]Court of Appeals applied Strickland to the facts of his case in an
19   objectively unreasonable manner.

20   1. Defense Petitioner Lacked Requisite Intent

21   Petitioner's initial argument that trial counsel erred in failing to present the

22   defense that petitioner lacked the requisite felonious intent to commit burglary is without merit

23   for the reasons previously discussed.

24   2. Mitigating Evidence at Sentencing

25   Petitioner next argues that trial counsel failed to present certain mitigating

26   evidence at sentencing and, as a result, petitioner was "victimized by the harshest sentence."

1  Petition, at 13.  Specifically, petitioner asserts counsel failed to inform the court that petitioner

2  "had never been to prison, served in the United States Army for 5 years, completed 3 years of

3  college after his medical discharge, and . . . did not have a juvenile record."  Id.

4      "When a judgment of imprisonment is to be imposed and the statute specifies

5  three possible terms, the court shall order imposition of the middle term, unless there are

6  circumstances in aggravation or mitigation of the crime."  Cal. Penal Code § 1170(b); Cal. Rule

7  of Court 4.420(a) and (b).  California Penal Code § 461 provides two, four and six-year terms of

8  imprisonment for first degree burglary (i.e., burglary of an inhabited dwelling (id., § 460(a)).

9  The trial judge imposed the upper term of six years based upon the following aggravating factors:

10 (1) defendant was armed with a weapon during the commission of the crime (Cal. Rule of Court

11 4.421(a)(2)); (2) the victim was particularly vulnerable (Rule 4.421(a)(3)); (3) defendant is a

12 serious danger to society (Rule 4.421 (b)(1)); (4) defendant has numerous prior convictions of

13 increasing seriousness (Rule 4.421(b)(2)); (5) defendant was on probation when the crime was

14 committed (Rule 4.421(b)(4)); and (6) defendant's prior performance on probation was

15 unsatisfactory (Rule 4.421(b)(5)).[15]

16 \\\\\

17

18      [15]  The trial judge reasoned (RT at 269):

19      The Court has reviewed the case to see if any circumstances exist which would
20      cause me to grant probation.  The Court finds none.

21      Further, this is a situation where [petitioner] was armed with a shotgun.  The
        victim was vulnerable.  He was an active participant.  He took – you know, I
        heard the trial of this matter, and quite frankly, he represents a danger to all of us.
22      So the Court denies probation.

23      For the violation of Penal Code Section 459, first degree residential burglary, the
        Court imposes the aggravated term of six years.  The Court chooses the
24      aggravated term of six years because, quite frankly, the defendant's dismal prior
        record, his prior convictions are numerous and [of] increasing seriousness.  He
25      was on probation when the crime was committed, and his prior performance on
        probation has been unsatisfactory.  So the Court chooses the aggravated term of
26      six years.

15

1    Petitioner is correct that trial counsel failed to present evidence of petitioner's

2   education and military service to the trial court.  However, a defendant's educational and military

3   records are not designated mitigating factors in sentencing.  See generally Cal. Rule of Court

4   4.423.  Moreover, this information was contained in the Pre-Sentence Report submitted to the

5   court, specifically, that petitioner is a high school graduate, earned 93 junior college credits

6   toward a degree in electronics, and served approximately 7 years in the Army, from which he was

7   medically discharged for an ankle condition.  Exh. B. to Answer (Pre-Sentence Report (Sealed))

8   at 5.  Petitioner also noted this information is his statement attached to the Pre-Sentence Report

9   ("I have been going to school and in the military").  Accordingly, there was no error in trial

10  counsel's failure to present this evidence to the trial court.

11    Petitioner is also correct that trial counsel failed to present evidence that petitioner

12  had not previously served prison time.  This information falls generally within the following

13  mitigating factor:  "The defendant has no prior record, or has an insignificant record of criminal

14  conduct, considering the recency and frequency of prior crimes."  Cal. Rule of Court 4.423(b)(1).

15  This evidence was, however, implicit in the Pre-Sentence report.[16]  Moreover, as noted supra (see

16  n. 15 and related text), petitioner's overall criminal record properly served as an aggravating,

17  rather than mitigating, factor.  Accordingly, the failure of trial counsel to inform the court that

18

19    [16]  There is, however, some ambiguity on this matter.  See generally, Pre-Sentence Report,
    at 3-4, and Addendum thereto entitled "Edited Criminal History."  For example, the Report states
20  that petitioner "was placed on deferred entry on [a] felony drug case, however, was later
    convicted on that charge, and eventually sentenced to prison in 2001, prior to his arrest in the
21  instant offense."  Report at p. 4.  Apparently petitioner did not commence serving this sentence.
    The Report also states that petitioner's poor probation performance "resulted in a prison
22  commitment occurring in January of 2001" (for which petitioner was apparently placed on
    further probation), and that petitioner was "sentenced to four years in state prison on 10-22-01"
23  (while petitioner was in jail pending trial on the instant charges).  Id. at 3.  The Attorney
    General's Memorandum states both that petitioner's assertion he never served prison time "is
24  false according to the probation report," but "[e]ven if it were true, it would hardly outweigh"
    circumstances in aggravation.  Respondent's Memorandum, at p. 9.  The Attorney General would
25  better have served this process by clarifying the matter.  Nonetheless, because the trial judge did
    not find to the contrary, this court construes the ambiguities of the Pre-Sentence Report to
26  support petitioner's representation he did not previously serve prison time.

petitioner had not previously served time in prison, while in error, was not prejudicial.

The only remaining evidence petitioner asserts trial counsel failed to present is that petitioner does not have a juvenile record; nor was this fact presented in the Pre-Sentence Report.  This evidence, like the absence of prior prison time, comes generally within the mitigating factor of an insignificant criminal record.  Cal. Rule of Court 4.423(b)(1).  However, like the absence of prior prison time, the lack of a juvenile record does not outweigh petitioner's overall criminal record as a significant aggravating factor.  Accordingly, the failure of trial counsel to inform the court that petitioner did not have a juvenile record was not prejudicial.

While the trial judge did not expressly find *any* mitigating factors (see RT at 269), he is deemed to have considered all relevant criteria in mitigation and aggravation unless the record affirmatively reflects otherwise.  Cal. Rule of Court 4.409.  The record does not suggest the trial judge failed to consider the factors in mitigation of petitioner's sentence that were presented by defense counsel.[17]

---

[17] Trial counsel made the following arguments in mitigation at petitioner's sentencing hearing (RT at 262-263; see also RT at 268):

> [T]here are, in my opinion, factors in mitigation that this report does not address. One being, I think, the jury's finding would certainly suggest that Mr. Perry was not an instigator of this action, and, two, that the jury made an express finding that he was not involved in the direct assaultive behavior by acquitting him of the assault charge.  And I think in that regard, the inference to draw from that is that Mr. Perry, although by their finding, was an aider and abettor, as the factors in mitigation would suggest, was a minor participant in that regard.

> And then, finally, I think the factors in mitigation would suggest that Mr. Perry was under the influence of at least alcohol at the time of this offense, and that although the jury's finding does not confirm his role as an aider and abettor, by not finding him as the actual aggressor, I think that that suggests a more mitigated term than Probation recommends.

> Then finally, on balancing, as the Court is aware, the co-defendant, Louise Tyo, who by the victim's testimony, committed the majority of the assaultive behavior against her and made the actual threats against her, by agreement with the District Attorney's office received a four-year term, I think that's a factor that the Court should take into consideration in the interest of justice in arriving at a term that is lesser than that set forth here in the Probation Department's recommendation.

1          Accordingly, petitioner's contention he was denied effective assistance of counsel

2   by the omission of significant mitigating evidence at sentencing is without merit.

3          One additional sentencing matter must be considered.  Petitioner's contention he

4   was improperly sentenced to the "harshest sentence" for burglary implicates the U.S. Supreme

5   Court's recent decision in Cunningham v. California, ___U.S.___, 127 S. Ct. 856 (Jan. 22,

6   2007) (assuming without deciding the decision is to matters on collateral review).[18]  Cunningham

7   requires imposition of a sentencing statute's middle term absent a finding of aggravating

8   circumstance(s) beyond a reasonable doubt.  Cunningham held that California's Determinate

9   Sentencing Law violates a defendant's right to jury trial to the extent it permits imposition of an

10  upper term based on aggravating factors found by the court alone.  The Cunningham Court relied

11  on its prior decisions in Apprendi and Blakely.  In Apprendi v. New Jersey, 530 U.S. 466, 120 S.

12  Ct. 2348 (2000), the Court held that any fact relied upon to increase the penalty for a crime

13  beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a

14  reasonable doubt.  In Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), the Court

15  explained that "the statutory maximum for Apprendi purposes is the maximum sentence a judge

16  may impose solely on the basis of the facts reflected in the jury verdict or admitted by the

17  defendant."[19]  542 U.S. at 303, 124 S. Ct. at 2537.  Cunningham defines the "statutory

18  _____

19  This evidence supported the mitigating factors set forth at Cal. Rules of Court 4.423(a)(1) (minor role) and (b)(2) (reduced culpability due to physical condition).

20       [18]  The undersigned has previously concluded that Cunningham is not intended to be
21  retroactively applied.  See Buckley v. Nakayema, 2007 WL 926520, *6 (E.D.Cal. March 27,
    2007); accord, Dropalski v. Stewart, 2007 WL 963989, *1 (W.D.Wash.March 28, 2007) (" There
22  is no indication the Supreme Court made Cunningham retroactive to cases that were final prior to
    its publication").

23       [19]  Petitioner's challenge to receiving the "harshest sentence" for his first degree burglary
24  conviction gained traction by Cunningham's designation of the middle term as the "prescribed
    statutory maximum sentence" under Apprendi.  Since petitioner did not challenge the substance
25  of the aggravating factors relied upon by the trial court to impose the upper term, his challenge
    was not based on Apprendi error per se.  Rather, such analysis is required only as a result of
26  Cunningham's requirement that an aggravated sentence be supported by finding aggravating
    circumstances beyond a reasonable doubt.  Accordingly, petitioner could not have raised this

maximum" as the middle term prescribed in California's sentencing statutes.  Id., 127 S. Ct. at 868.

Significantly, a court's reliance on the aggravating factor of "prior convictions" remains an exception.[20]  See Cunningham, 127 S. Ct. at 868, citing Apprendi, 530 U.S. at 490; see also Jones v. United States, 526 U.S. 227, 243, n. 6, 119 S. Ct. 1215 (1999).  Moreover, "a single factor in aggravation suffices to support an upper term."  People v. Osband, 13 Cal. 4th 622, 730 (1996), citing People v. Castellano, 140 Cal. App. 3d 608, 615 (1983) ("[a] single factor in aggravation is a sufficient basis for a sentencing choice"); see also People v. Steele, 83 Cal. App. 4th 212, 226 (2000) ("the finding of even one factor in aggravation is sufficient to justify the upper term ").[21]  The trial court's reliance on petitioner's prior convictions (RT at 269), as set forth in the Pre-Sentence Report,[22] was therefore sufficient to support imposition of the upper term for petitioner's first degree burglary conviction.

Accordingly, since petitioner has failed to demonstrate any significant error in his sentencing, he has failed to demonstrate ineffective assistance of counsel on this basis.

claim below.

[20]   This court does not address whether the additional aggravating factors that (1) petitioner committed the instant offenses while on probation, and (2) thereby demonstrated unsatisfactory performance while on probation (see Cal. Rules of Court 4.421(b)(4) and (5)), may also meet the Blakely requirement of "facts reflected in the jury verdict or admitted by the defendant."

[21]   California courts have applied this rule post-Cunningham to sustain the imposition of aggravated sentences based upon prior convictions.  See, e.g., People v. Camacho, 2007 WL 1723950, *7, (Cal. App. 4th Dist.) (June 15, 2007)), People v. Torres, 2007 WL 1704916, *7, (Cal.  App. 2nd Dist.) (June 14, 2007), People v. Athey, 2007 WL 1723396, *2 (Cal.App. 5th Dist.) (June 14, 2007); see also, U.S. v. Grisel ___ F.3d ___, 2007 WL 1599009 (June 5, 2007) ("[t]he Court . . . preserved the exception for prior convictions"); but see, e.g., People v. Parrish, 2007 WL 1739751, *6, (Cal. App. 4th Dist.) (June 18, 2007), and People v. Mesa, 2007 WL 1723944, *5, (Cal. App. 1st Dist.) (June 15, 2007) (resentencing required based on reconsideration of all aggravating and mitigating factors).

[22] The Pre-Sentence Report recounts prior misdemeanor convictions for reckless driving, petty theft, battery, and vehicle theft; and a prior felony drug conviction.  Pre-Sentence Report at 4.

3.  Failure to Obtain Plea Agreement

Petitioner states that on June 1, 2002, his first lawyer, John Coffer, informed him that the prosecution was willing to drop the charges in this case in exchange for petitioner pleading guilty to forgery in another case, and petitioner agreed.  Petition at 14.  Thereafter, petitioner's lawyer told him that the interrogation tape in this case was lost, that counsel wanted time to locate and listen to it, and asked petitioner to waive time.  Id.  Petitioner "tells the attorney that doesn't sound right just bring him the deal so he can get the charges in this matter dismissed as a result of the plea bargain."  Id.  Petitioner states he then argued with his lawyer who, "instead of giving [petitioner] the plea agreement to sign, out of spite . . . tells [petitioner] that the matter will get resolve[d] in two weeks."  Id.  Petitioner asserts this case was then switched from "Judge Ramon Garret's Courtroom" to "Judge Harry S. Kinnicutt's Courtroom" and the plea agreement "taken off the table."  Petitioner contends these circumstances "resulted in the conviction that appellant is currently serving."  Id.

Petitioner apparently references June 1, 2001 (not 2002), as he was tried in November 2001 and sentenced in January 2002.  The record fails to support petitioner's contention.  Although (1) it is clear that petitioner anticipated an early plea agreement that would result in the instant charges being dropped (see, e.g., Exh. D (Vol. 1)  to Answer, at 8); (2) this agreement failed to materialize about the time of the August 28, 2001 hearing (at which Coffer sought to withdraw, petitioner was referred for competency assessment and forcibly removed from the courtroom); (3) Coffer likely sought to convince petitioner to agree to a four-year term (as accepted by codefendant Tyo) which petitioner declined because he thought he would be exonerated (see, e.g., the reports finding petitioner competent but noting his disputes with Coffer (Exh. B to Answer (letters)); and (4) the record supports petitioner's assertion that Coffer's own schedule dictated his request for a continuance in petitioner's case (CT at 32-34) – petitioner has nonetheless failed to demonstrate that counsel's actions were responsible for the withdrawal of any plea agreement.  Petitioner has not demonstrated he was unable to make a favorable plea as a

20

1  result of his counsel's actions, let alone his counsel's unreasonable professional judgment.

2  Strickland, 466 U.S. at 688-690.

3          Accordingly, petitioner's ineffective assistance claim based on a withdrawn plea

4  agreement is without merit.

5          4. Failure to Call Defense Witness and Petitioner

6          Petitioner asserts that he "endeavored to get the attorney to subpoena [a] witness

7  in his defense which was neglected,[23] and appellant wanted to testify as to his character which

8  was also neglected." Petition, at p. 14.

9          With respect to the testimony of a defense witness, "'the accused must show who

10 they are, what their testimony will be, that the testimony will be competent and relevant,'" and

11 that the witness is available.  U.S. v. Hoyos, 573 F.2d 1111, 1114 (9th Cir. 1978), quoting Leino

12 v. United States, 338 F.2d 154, 156 (10th Cir. 1964) (merits of continuance to obtain defense

13 witness).  Petitioner has provided none of this information.  He does not identify the witness nor

14 the content of the witness' testimony.  Absent this information it is impossible to ascertain

15 whether there is any reasonable possibility the witness's testimony would have changed the

16 outcome of the trial.  Petitioner's citation is unhelpful.  In People v. Williams, 102 Cal. App. 3d

17 1018 (1980), the court found that appellant had failed to sustain his burden of showing that

18 counsel's failure to secure a defense witness resulted in the withdrawal of a potentially

19 meritorious defense.

20          With respect to petitioner's own testimony, it is well established that a defendant

21 has "the ultimate authority" to determine whether to testify on his own behalf.  Florida v. Nixon,

22 543 U.S. 175, 186, 125 S. Ct. 551, 560 (2004).  Defense counsel must consult with the defendant

23

24          [23] Defense counsel did call two defense witnesses:  (1) Officer Ronald Jacobson, who
   testified that Tracy Pruitt did not mention, upon her initial interview by police, that a black male
25 was involved in her assault (RT 136-144); and (2) codefendant Louise Tyo, who testified that
   petitioner did "nothing" at the victim's house other than "made some pizza" and "fed the dog"
26 (RT at 149, see generally RT at 145-154).

and obtain consent as to the recommended course of action.  Id.  In order to prevail on an

ineffective assistance claim, however, petitioner must demonstrate that defense counsel made a

unilateral decision that petitioner would not testify, and that there is a reasonable possibility this

decision prejudiced petitioner at trial.  Petitioner has demonstrated neither.  Rather, it is

reasonable to infer that trial counsel made a reasonable tactical decision that petitioner not testify,

particularly as to his own character.  Had the defense introduced evidence of petitioner's

character, the prosecution would then have been able to oppose it.  See Cal. Evid. Code § 1102.

"[G]ood reasons exist for not introducing character evidence.  Evidence of the defendant's bad

character is not admissible in a criminal case unless he first introduces evidence of his good

character. (Evid. Code, § 1102.)  For this reason, most experienced criminal lawyers do not

present character evidence unless their client's reputation is unassailable."  People v. Pangelina,

153 Cal. App. 3d 1, 8 (1984).  The record demonstrates petitioner's character, while

commendable in some respects, was not unassailable.  Petitioner has therefore failed to

demonstrate he was prejudiced by not testifying.

　　　　　Accordingly, petitioner's ineffective assistance claim, based upon the alleged

failure of defense counsel to call a defense witness and obtain petitioner's testimony, is without

merit.

　　　　　　　　　　　5.  Failure to Impeach Testimony of Victim Tracy Pruitt

　　　　　Petitioner asserts "he had a right to impeach Tracy Pruitts [sic] because she was a

known drug offender who[] was on the run from a drug program with a current warrant pending

for her arrest and in exchange for her testimony with the false statements she was allowed

immunity."  Petition, at p. 14.  Petitioner asserts this matter implicates counsel's failure to

investigate, citing People v. Shaw, 35 Cal. 3d 535 (1984).

　　　　　The Confrontation Clause of the Sixth Amendment provides, "In all criminal

prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

him. . . ."  This right, extended to the States by the Fourteenth Amendment, includes the right to

1   cross-examine witnesses.  Cruz v. New York, 481 U.S. 186, 189, 107 S. Ct. 1714 (1987), citing

2   Pointer v. Texas, 380 U.S. 400, 404, 85 S. Ct. 1065 (1965).  Petitioner's contention requires he

3   demonstrate that defense counsel's failure to elicit the above information from Pruitt was due to

4   an unreasonable professional judgment that altered the outcome of this case.  Strickland, 466

5   U.S. at 689-690, 694.

6          This contention lacks merit for the following reasons.  Petitioner's counsel raised

7   this matter before the trial court in limine after the court's ruling denying petitioner's to suppress.

8   RT at 43-45.  Counsel stated, "My investigator . . . discovered that there was an outstanding

9   warrant for the victim, Tracy Pruitt, on two probation matters.  She's technically in violation of

10  her probation and at least as of last week was in warrant status. . . . I wanted permission to

11  inquire at least as to the fact that she was in warrant status with her probation."  RT at 43.  The

12  prosecution clarified that Pruitt was "on probation on two misdemeanor 11377s [Cal. Health &

13  Safety Code § 11377 (unauthorized possession of controlled substance)], and I believe the

14  warrant is because of a failure of the program."  Id. at 44.  The prosecution also noted, "[N]or has

15  there been any dealings with that case as it relates to her testimony in this case."  Id.  The court

16  ruled that either counsel could elicit Pruitt's testimony that she was on probation for undisclosed

17  misdemeanors ("the theory being they may be shading their testimony to curry favor with the

18  authorities," of which "there's a greater chance" if its felony probation) but that the specific

19  nature of the probation was not relevant because hers was "not a crime of moral turpitude" and

20  her warrant status was not "particularly probative."  Id. at 44-45.

21         At trial, defense counsel elicited Pruitt's testimony that she was "on two counts of

22  misdemeanor probation."  Id. at 102.  The prosecution elicited Pruitt's testimony that she had

23  made no deals in exchange for her testimony.  Id. at 104-105.  The primary thrust of defense

24  counsel's questioning was successively aimed at demonstrating that petitioner was not actively

25  involved in the assault against Pruitt.  Id. at 85-102.

26  \\\\\

23

1    Thus, the record does not support petitioner's assertion that Pruitt cut a deal with

2  the prosecution for her testimony; defense counsel would have been unsuccessful had he sought

3  to elicit such testimony.  Petitioner has therefore failed to demonstrate that his trial counsel

4  exercised unreasonable professional judgment.  Moreover, given Pruitt's testimony that

5  petitioner played only a minor role in her assault, it was in petitioner's best interests that the jury

6  credit Pruitt's testimony.

7    Shaw is inapposite, as it involved defense counsel's failure to investigate the

8  factual basis for his client's defense claims, including mistaken identity and a potentially

9  meritorious alibi, which bore some corroboration in the record.  Id., 35 Cal. 3d at 542.  In

10  contrast, petitioner has made no showing that impeachment of Pruitt on the grounds averred

11  would have had a substantial impact on the jury's verdict.  Cf., Reynoso v. Giurbino, 462 F.3d

12  1099, 1118 (9th Cir. 2006) (evidence would have explained why key prosecution witnesses may

13  have fabricated their testimony and therefore had a substantial impact on the jury's assessment of

14  those witnesses' credibility).

15    Since petitioner has failed to demonstrate he was prejudiced by defense counsel's

16  failure to impeach Pruitt, his ineffective assistance claim based upon this allegation is without

17  merit.

18    6. Summary of Ineffective Assistance Claims

19    Petitioner has met neither prong of the Strickland standard.  He has failed to

20  demonstrate that counsel's performance fell below an objective standard of reasonableness or

21  that petitioner was prejudiced by any error.  The Supreme Court's summary denial of petitioner's

22  ineffective assistance claim was both reasonable and supported by the record.

23    Accordingly, petitioner is not entitled to relief based upon his ineffective

24  assistance claim.

25  \\\\\

26  \\\\\

1    D. PETITIONER'S STATEMENTS TO LAW ENFORCEMENT

2              Petitioner contends the trial court erred in denying his motion in limine to exclude

3    his statements to Detective Curtis.[24]  CT at 96-105.  Cal. Evid. Code § 402.  After hearing the

4    parties' arguments, viewing the videotape of petitioner's police station interview, and listening to

5    the testimony of Detective Curtis and Dr. Carlton Purviance (a clinical psychologist who opined

6    on behalf of petitioner that he was mentally impaired due to alcohol intoxication during the

7    interview),[25] the trial court denied the motion.  RT at 8-43.  The court found that all of

8    petitioner's statements to Detective Curtis were voluntary; the interview was not a custodial

9    interrogation requiring a Miranda admonishment;[26] and petitioner was mentally unimpaired

10   during the interview.[27]  Accordingly, the jury was permitted to view and consider the entire

---

12       [24]  Although defense counsel Robert Fracchia stated to the trial court that petitioner did
     not seek to exclude his initial statement to Detective Curtis that "I was there, I knew you were
13   coming," but rather "the interview at the police department," petitioner's motion sought to
     exclude all statements he made to the detective.

14       [25]  Dr. Purviance interviewed petitioner twice and reviewed the police station videotape.
15   RT at 29-30.

16       [26]  In Miranda v. Arizona, 384 U.S. 436, 444-445, 86 S. Ct. 1602 (1966), the Supreme
     Court held that "the prosecution may not use statements, whether exculpatory or inculpatory,
17   stemming from custodial interrogation of the defendant unless it demonstrates the use of
     procedural safeguards effective to secure the privilege against self-incrimination. . . . [T]he
18   following measures are required.  Prior to any questioning, the person must be warned that he has
     a right to remain silent, that any statement he does make may be used as evidence against him,
19   and that he has a right to the presence of an attorney, either retained or appointed.  The defendant
     may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and
20   intelligently.  If, however, he indicates in any manner and at any stage of the process that he
     wishes to consult with an attorney before speaking there can be no questioning.  Likewise, if the
21   individual is alone and indicates in any manner that he does not wish to be interrogated, the
     police may not question him.  The mere fact that he may have answered some questions or
22   volunteered some statements on his own does not deprive him of the right to refrain from
     answering any further inquiries until he has consulted with an attorney and thereafter consents to
23   be questioned."

24       [27]  The trial court stated (RT at 179-80; see also RT at 43):

25       The defendant's statement to Detective Curtis made at the Vacaville Police
         Department was voluntary.  There were no inappropriate inducements,
26       intimidation or threats.  The defendant's statement was the product of a rational
         intellect and a free will.  The defendant was not impaired by either alcohol or

videotape.  RT at 118.

The Court of Appeal affirmed on the same grounds (Exh. I to Answer, at 4-8).[28]

illegal drugs.  His responses were appropriate given the questions and the entire situation the defendant was in.  The defendant appeared depressed, and the Court, understanding his situation, finds his demeanor appropriate.

Finally, the Court finds that the interview conducted by Detective Curtis was not a custodial interrogation and the defendant was not under arrest and was told he could leave at any time, a belief the defendant obviously maintained right to the end of the interview.

At page 38 out of the 40-page interview, he stated, quote, "Off the record.  If I – if I'm going to take – am I going to be put under arrest if I give you Joe?"  close quote.  This circumstantially proves that the defendant knew he was not under arrest and was free to leave at any time.

The Court finds no evidence to suggest that defendant was mentally impaired.  The Court rejects Dr. Purviance's opinion that the taped interview proved the defendant was mentally impaired.

Finally, when the officer gave the defendant his <u>Miranda versus Arizona</u> rights, there is no violation of <u>Miranda</u>.

[28]  The Court of Appeal reasoned in full (Exh. I. to Answer, at 4-8):

**A.  Interview was Not a Custodial Interrogation**

"<u>Miranda</u> requires that a criminal suspect be admonished of specified Fifth Amendment rights.  But in order to invoke its protections, a suspect must be subjected to custodial interrogation, i.e., he must be taken into custody or otherwise deprived of his freedom in any significant way.' ([<u>Miranda</u>,] <u>supra</u>, 384 U.S.] at p. 444 [].)  '[T]he ultimate inquiry is simply whether there is "a formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'  (<u>California v. Beher</u> (1983) 463 U.S. 1121 [103 S. Ct. 3517], quoting <u>Oregon v. Mathiason</u> (1977) 429 U.S. 492, 495 [97 S. Ct. 711].) [¶ ] Whether custody has occurred short of a formal arrest depends upon the totality of the circumstances, including such factors as:  (1) the site of the interrogation; (2) whether the investigation has focused on the suspect; (3) whether the indicia of arrest are present; and (4) the length and form of the questioning.  No one factor is dispositive.  (<u>People v. Boyer</u> [(1989)] 48 Cal. 3d 247, 272.)" (<u>People v. Morris</u> (1991) 53 Cal. 3d 152, 197.)  On the issue of custody, the relevant question is how a reasonable person in the suspect's position would have understood the situation.  (<u>Berkemer v. McCarty</u> (1984) 468 U.S. 420, 442 [104 S. Ct. 3138].)  We accept factual findings made below if they are supported by substantial evidence, but we independently review legal conclusions the trial court has drawn from these facts.  (<u>People v. Stansbury</u>, <u>supra</u>, 9 Cal. 4th at p. 831; <u>People v. Boyer</u>, <u>supra</u>, at p. 263.)

Perry approached Officer Curtis on the street and, without prompting, told Curtis

"'I was there . . . .'" and indicated he had expected a visit from the police. Officer Curtis told Perry he "didn't have a clue if he was the person [Curtis] wanted to talk with," and asked if Perry would come to the police department to give a statement. Perry agreed. He was not handcuffed and not under arrest. He rode in the front seat of Curtis's unmarked police car, while Curtis's partner rode in back. At the station, they entered an interview room. At the beginning of the recorded interview, Officer Curtis told Perry: "Like I said, you're not under arrest at this time. You're free to go. Get you right back when we're all done with this. . . " Curtis explained he was tape-recording the interview so he could recall the information Perry provided, and then the officer stated: "At this point, sir, I don't know what your involvement is. All I know is – well, based on what you just said to me, that you were at this house, that an assault took place. If you're a witness to it, then that's what you are." Several minutes into the interview, Officer Curtis advised Perry of his <u>Miranda</u> rights. Before doing so, Curtis reminded Perry he was not under arrest and he could "get up and walk out of this room still right now." At the Evidence Code section 402 hearing, Curtis testified he read Perry the <u>Miranda</u> warnings once he determined, in questioning, that Perry was a suspect and not merely a witness to the crimes under investigation.

Perry claims statements he made before the <u>Miranda</u> advisement should have been suppressed because they were made during a custodial interrogation. He argues the site of the questioning, a police stations' interview room, was an "'inherently coercive environment.'" (<u>See People v. Celaya</u> (1987) 191 Cal. App. 3d 665, 672.) However, Perry came to the station voluntarily and was advised at the outset of the interview, and again when the <u>Miranda</u> rights were read, that he was not under arrest and was free to leave. A reasonable person told twice he was not under arrest and was free to leave would not believe he was in custody. (See <u>Oregon v. Mathiason</u>, <u>supra</u>, 429 U.S. at pp. 493-495 [interrogation of defendant who came voluntarily to police station and was told he was not under arrest was not custodial].) Nor was the interview converted into a custodial interrogation because Perry rode to the station in the front of a police car. (See <u>People v. Stansbury</u>, <u>supra</u>, 9 Cal.4th at pp. 831-832 [reasonable person who rides to police station in front of patrol car would not feel taken into custody].)

While conceding the interview was not particularly lengthy, Perry also asserts the "accusatory" tone of Officer Curtis's questions rendered the proceeding coercive. But this complaint ignores Officer Curtis's statement in the beginning of the interview that he did not know the extent of Perry's involvement. In addressing a very similar factual scenario, the United States Supreme Court in <u>Oregon v. Mathiason</u> concluded the location of an interview at a police station, or an officer's focus on the defendant, does not render the questioning "custodial" when the defendant's freedom to leave had not been restricted in any way. The court stated: "Such a noncustodial situation is not converted to one in which <u>Miranda</u> applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.'" Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to

administer <u>Miranda</u> warnings to everyone whom they question.  Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one who the police suspect.  <u>Miranda</u> warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'  It was that sort of coercive environment to which <u>Miranda</u> by its terms was made applicable, and to which it is limited."  <u>Oregon v. Mathiason</u>, <u>supra</u>, 429 U.S. at p. 495.

Perry was repeatedly advised that he was not under arrest and was free to leave, and it appears the officers did not restrict his freedom of movement in any way until, at the conclusion of the interview, they ultimately arrested him.  Because Perry's statements were not made in the course of a custodial interrogation, they were not subject to exclusion under <u>Miranda</u>.

**B.  Statements Were Voluntary**

Perry next argues the entire interview should have been excluded because his statements prior to the <u>Miranda</u> warnings were not freely and voluntarily given. Before a defendant's statement may be admitted into evidence, the prosecution has the burden of proving by a preponderance of the evidence that the statement was voluntary, "and not the result of some form of compulsion or promise of reward."  (<u>People v. Jimenez</u> (1978) 21 Cal. 3d 595, 692; <u>see People v. Markham</u> (1989 (49 Cal. 3d 63, 71 [preponderance of evidence standard applies to crimes committed after passage of Proposition 8].)  "This court must examine the uncontradicted facts surrounding the making of the statements to determine independently whether the prosecution met its burden and proved that the statements were voluntarily given without previous inducement, intimidation or threat. [Citations.] With respect to the conflicting testimony, the court must 'accept that version  of events which is most favorable to the People, to the extent that it is supported by the record.' [Citation.]" (<u>People v. Hogan</u> (1982) 31 Cal. 3d 815, 835.)  We apply a "totality of the circumstances" test to determine the voluntariness of a confession.  (<u>People v. Weaver</u> (2001) 26 Cal. 4th 876, 920; see also <u>Withrow v. Williams</u> (1993) 507 U.S. 680, 693-694.)

First, Perry complains Officer Curtis asked pointed, leading questions, which indicated he knew more about the incident than he had originally led Perry to believe.  However, Perry does not claim he was mislead or threatened.  The officer's questions, which appear to have been asked in a respectful manner, were neither intimidating nor "so coercive as to overcome defendant's free will or constitute a 'motivating cause' of this subsequent confession. [Citations.]" (<u>People v. Kelly</u> (1990) 51 Cal. 3d 931, 952-953.)

Next, Perry claims his statements were improperly induced by Officer Curtis's "'false promise'" that he would allow Perry to go home after the interview.  But Perry fails to explain how Officer Curtis's statement, "Get you right back when we're all done with this," overbore his will or coerced him into making an involuntary confession.  Indeed, the statement does not even appear to be an inducement.  Curtis did not condition Perry's ability to go home on talking with the police; rather, he said, "Get you right back when we're done with this"

28

Petitioner contends that his police station interview was a "custodial interrogation" (thus requiring exclusion of his pre-<u>Miranda</u> statements because made without the requisite admonishment), and that none of his statements to Detective Curtis were voluntary, due both to petitioner's intoxication and the officer's coercive questioning  (thus requiring exclusion of all his statements).  These contentions – petitioner's fourth and fifth claims – are addressed in tandem.

The court notes initially that the evidence supports the trial court's rejection (and Court of Appeals' affirmance thereof) of Dr. Purviance's opinion that petitioner was mentally impaired during his interview with Detective Curtis.  Dr. Purviance based his opinion on petitioner's "garrulous" demeanor during the videotaped interview, in contrast to petitioner's "reserved, almost guarded" demeanor when interviewed twice earlier by Dr. Purviance.[29] However, Dr. Purviance testified on cross-examination that he had never spoken with petitioner about the videotape or the instant crime, and had not spoken with petitioner since viewing the videotape.  <u>See</u> RT at 26-38.  Moreover, the only basis for Dr. Purviance's opinion that

immediately after he told Perry he was not under arrest and was free to go. (Contrast <u>People v. Flores</u> (1983) 144 Cal. App. 3d 459, 471-471 [officer impliedly promised defendant could be released on his own recognizance only if he made an appropriate statement].)  Moreover, there is no evidence to suggest Officer Curtis's statement, which was made at the outset of the interview, was the "'motivating cause'" of any admissions made by Perry.  (See <u>People v. Vasila</u> (1995) 38 Cal. App. 4th 865, 873, 876-877 [confession involuntary only if motivated by false promise or inducement].)

Finally, relying on testimony from his expert witness at the Evidence Code section 402 hearing, Perry suggests his confession was involuntary because he was intoxicated during the interview.  However, the trial court specifically rejected this expert's testimony and found no evidence of intoxication or mental impairment. We are bound by this factual finding, which is supported by the record.  (See <u>People v. Hogan</u>, <u>supra</u>, 31 Cal. 3d at p. 835.)

Viewing the totality of circumstances, we conclude Perry's statements to police were voluntary, and the interview was properly admitted.

[29]  Dr. Purviance interviewed petitioner at the county jail twice, in September 2000 and September 2001, on matters unrelated to this case.  RT at 27-28.

1   petitioner's mental impairment was due to alcohol was, " I knew that there had been a history of

2   alcohol, and it seemed probable to me that at the time he gave his statement he had been drinking

3   alcohol." Id. at 31.  Detective Curtis testified he did not recall if there was any odor of alcohol

4   on petitioner when they talked.  Id. at 16.  This record supports the trial court's rejection of Dr.

5   Purviance's opinion as unsubstantiated and the court's finding petitioner was mentally

6   unimpaired during his interview with Detective Curtis.

7           The record also supports the further finding of the trial court that petitioner's

8   interview was not a custodial interrogation.  "Custodial interrogation" means "questioning

9   initiated by law enforcement officers after a person has been taken into custody or otherwise

10  deprived of his freedom of action in any significant way." Miranda , 384 U.S. at 444.  Whether

11  an individual is "in custody" for purposes of Miranda is an objective test.  Yarborough v.

12  Alvarado, 541 U.S. 652, 662-63, 124 S. Ct. 2140 (2004).  Two inquiries are required:  (1) the

13  overall circumstances surrounding the interrogation; and (2) given those circumstances, whether

14  a reasonable person in the individual's situation would have felt free to terminate the

15  interrogation and leave.  Id., see also Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526

16  (1994) ("the ultimate inquiry is simply whether there [was] a formal arrest or restraint on

17  freedom of movement of the degree associated with a formal arrest") (quoting California v.

18  Beheler, 463 U.S. 1121, 1125, 103 S. Ct. 3517 (1983); Berkemer v. McCarty, 468 U.S. 420, 442,

19  104 S. Ct. 3138 (1984) (custody must be determined based on a how a reasonable person in the

20  suspect's situation would perceive his circumstances and "[a] policeman's unarticulated plan has

21  no bearing on the question whether a suspect was 'in custody' at a particular time").  The

22  protections provided by Miranda attach only when an individual is both in custody and being

23  interrogated.  See McNeil v. Wisconsin, 501 U.S. 171, 182, n. 3, 111 S. Ct. 2204 (1991).  "[T]he

24  term 'interrogation' under Miranda refers not only to express questioning, but also to any words

25  or actions on the part of the police (other than those normally attendant to arrest and custody) that

26  the police should know are reasonably likely to elicit an incriminating response from the

1  suspect." Rhode Island v. Innis, 446 U.S. 291, 301, 100 S. Ct. 1682 (fn. omitted) (1980).

2       Petitioner contends his entire interview was custodial based on the following: he

3  was transported to the station by two officers in a police car; he was formally questioned in a

4  police interrogation room; the questions posed were accusatorial; and the interview was

5  videotaped. Petitioner asserts these factors created a custodial environment that led petitioner to

6  believe he was under arrest the entire period. However, the record does not support petitioner's

7  characterization.

8       Rather, it is reasonable to infer, based on Detective Curtis' testimony and the

9  transcript of his interview with petitioner, that petitioner both initiated and encouraged Detective

10  Curtis' interview with the goal of "explaining" his allegedly limited involvement in the crime;

11  that petitioner genuinely believed, at least initially, that he would be able to avoid arrest and

12  prosecution by speaking with Detective Curtis, even after Detective Curtis proceeded to "fill

13  [petitioner] in a little bit" to let him know what the detective knew. Exh. E to Answer, at 9.

14  Only after Detective Curtis stated he had "some specific questions" he wanted to ask petitioner

15  "that might spook you" and would therefore read petitioner his Miranda rights, did petitioner

16  express concern, stating, "I know I'm being [put] under arrest." Id. at 15. However, the

17  following discussion ensued (id.):

18     Det. Curtis:   You ain't under arrest. You realize that still; correct?
       Petitioner:    Uh-huh.
19     Det. Curtis:   Yes or No?
       Petitioner:    (Inaudible)
20     Det. Curtis:   You are not under arrest. You can get up and walk out of this
                      room still right now.
21     Petitioner:    Uh-huh.
       Det. Curtis:   But I still have some questions I want to ask you, some specific
22                    stuff that you haven't touched on. But in order for me to ask them, I feel more
                      comfortable letting you know you have rights, okay?
23     Petitioner:    (Inaudible response)

24  At this point Detective Curtis informed petitioner of his Miranda rights, which petitioner stated

25  he understood. Id. at 15-16. Petitioner continued to answer the officer's questions. When first

26  questioned about how to contact Finocchio, petitioner seemed to debate his status and whether to

1   provide this information, reasoning aloud, "I'm already in trouble.  I already know this."  <u>Id</u>. at

2   30.  However, near the close of the interview, petitioner demonstrated his understanding that he

3   was not in custody, asking, "Off the record – if I – if I'm going to take – am I going to be put

4   under arrest if I give you Joe?"  <u>Id</u>. at 38.

5          The Court of Appeal reasonably concluded petitioner was not in custody at any

6   point during his interview.  The appellate court relied on the following factors:  Detective Curtis

7   was initially unaware that petitioner was the "Eric" he was looking for; petitioner went to the

8   police station voluntarily, riding in the front of the police car; petitioner was advised at the outset

9   of the interview, and again when his <u>Miranda</u> rights were read, that he was not under arrest and

10  was free to leave; the officers did not restrict petitioner's  freedom of movement in any way; the

11  interview was not "particularly lengthy" (it lasted about an hour); and Detective Curtis'

12  questioning and the location of the interview were no more coercive than their inherently

13  "coercive aspects."  Opinion at 4-6.  These facts, in addition to those noted above,[30] demonstrate

14  that during his interview petitioner was not "deprived of his freedom of action in any significant

15  way," <u>Miranda</u> , 384 U.S. at 444, certainly not to "the degree associated with a formal arrest,"

16  <u>Stansbury</u>, 511 U.S. at 322.   Because petitioner's interview did not meet the criteria for a

17  custodial interrogation, it was unnecessary that petitioner be admonished pursuant to <u>Miranda</u>.

18  Thus, petitioner's pre-<u>Miranda</u> statements cannot be excluded on the ground they were elicited

19  without admonishment.

20          Similar facts support the determinations of the trial court and Court of Appeal that

21  petitioner's statements were made voluntarily.  The Fifth Amendment to the U.S. Constitution

22  provides that, "No person . . .  shall be compelled in any criminal case to be a witness against

23  himself."  A defendant must be able freely to exercise the choice whether to speak with law

24

25          [30]  In addition, petitioner makes the inconsistent argument that he earnestly believed
    (purportedly due to his intoxication) that Detective Curtis would give him a ride home after the
26  interview.  Petition at 25.

1   enforcement and statements involuntarily given must be excluded.  "[T]he privilege is fulfilled

2   only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the

3   unfettered exercise of his own will.'"  <u>Miranda</u>, 384 U.S.  at 460, quoting  <u>Malloy v. Hogan</u>, 378

4   U.S. 1, 8, 84 S.Ct. 1489 (1964).  The goal is to eliminate "interrogation practices which are likely

5   to exert such pressure upon an individual as to disable him from making a free and rational

6   choice" to speak.  <u>Miranda</u>, 384 U.S. at 464-465.  "[A] confession obtained by police through the

7   use of threats is violative of due process and [] the question in each case is whether the

8   defendant's will was overborne at the time he confessed.  In short, the true test of admissibility is

9   that the confession is made freely, voluntarily, and without compulsion or inducement of any

10  sort.  And, of course, whether the confession was obtained by coercion or improper inducement

11  can be determined only by an examination of all of the attendant circumstances."  <u>Haynes v.</u>

12  <u>State of Washington</u>, 373 U.S. 503, 513-514, 83 S. Ct. 1336 (1963) (citations and internal

13  quotations omitted).

14          Petitioner contends the factors that made his interview custodial also rendered

15  Detective Curtis's questioning so coercive as to overcome petitioner's free will.  Petitioner

16  emphasizes that Detective Curtis' questions were accusatorial and specifically intended to elicit

17  incriminating admissions, based upon Detective Curtis' greater knowledge of petitioner's

18  involvement than he initially disclosed.

19          The record does not support this contention.  Petitioner's statements throughout

20  the interview demonstrate his attempt to curry some favor by "telling all."  Petitioner emphasized

21  his cooperation with law enforcement while distancing himself from the other defendants:

22  "These people – man, there's some crazy people.  Man, I didn't know they were going to do all

23  this.  I swear, man, that I wouldn't have went.  That's shit, man, I know – I already knew you all

24  were coming.  That's why I stayed home, (Inaudible).  I wasn't running like him [Finnochio]."

25  Exh. E to Answer, at 38-39.  Similarly, when asked details about the assault on the victim,

26  petitioner stated, "Sir, I'd tell you everything if I could, but I wasn't in the room. . ."  <u>Id</u>. at 28.  It

1  is reasonable to infer from the transcript that petitioner willingly participated in the interview to

2  "tell it like it was," both to assuage his own conscience and to evade or minimize any

3  consequences.  Petitioner's answers to Detective Curtis' questions do not appear coerced or

4  elicited unfairly.  Further, as the Court of Appeal found, the transcript of the interview

5  demonstrates that Detective Curtis' questions were not threatening or misleading and were

6  "asked in a respectful manner" without intimidation or coercion.

7          The Court of Appeal's reasoning in affirming the trial court's decision to admit

8  plaintiff's interview statements was neither contrary to, nor an unreasonable application of,

9  clearly established federal law, nor did it constitute an unreasonable assessment of these facts.

10  28 U.S.C. § 2254(d)(1), (2).

11          Accordingly, petitioner is not entitled to relief based upon his fourth and fifth

12  claims challenging the admissibility of his statements to law enforcement.

13  E.  CALJIC NO. 17.41.1

14          Petitioner contends he was effectively denied his Sixth Amendment right to a jury

15  trial by the trial court's instruction to the jury pursuant to CALJIC No. 17. 41.1.  That instruction,

16  as given (RT at 248), provides:  "The integrity of a trial requires that jurors, at all times during

17  their deliberations, conduct themselves as required by these instructions.  Accordingly, should it

18  occur that any juror refuses to deliberate or expresses an intention to disregard the law or to

19  decide the case based on penalty or punishment, or any other improper basis, it is the obligation

20  of the other jurors to immediately advise the court of the situation."

21          Petitioner contends this instruction exerts a chilling effect on deliberations by

22  denying jurors their "right to speak freely during deliberations without fear of punishment."

23  Petition, at p. 29.  Petitioner argues the instruction "threaten[s] jurors with the prospect that their

24  every word may be reported to the trial court any time that even one other fellow juror imagines

25  an impropriety."  Id.  He asserts the instruction "eviscerates the function of the jury" and

26  "undermines the democratic safeguard enshrined in the jury institution."  Id. at 30, 31.

1    Petitioner does not identify any way in which the verdict in his own case may

2 have been impacted by CALJIC 17.41.1, but claims generally that "[t]here is no way to assess

3 how much the instruction chilled speech in the jury room.  The record cannot shed light on what

4 thoughts or arguments were squelched by jurors who reared [sic] or simply did not want to incur

5 the possibility of reporting to and sanctioning by the trial court."[31]  Id. at 33.

6    The Court of Appeal rejected this contention based upon the California Supreme

7 Court's July 2002 decision in People v. Engelman, 28 Cal. 4th 436 (2002).[32]  The Engelman

8 court ruled that CALJIC 17.41.1 "does not infringe upon defendant's federal or state

9 constitutional right to trial by jury or his state constitutional right to a unanimous verdict," but

10 nonetheless directed trial courts to discontinue use of the instruction because of its potential to

11 intrude upon jury deliberations.  Id. at 439-40.

12    The Ninth Circuit thereafter ruled in Brewer v. Hall, 378 F.3d 952, 955-57 (9th

13 Cir. 2004) that a California Court of Appeal's reliance on Engelman to reject a constitutional

14 challenge to CALJIC 17.41.1 was, under AEDPA, "not contrary to or an unreasonable

15 application of clearly established Supreme Court precedent, because no Supreme Court case

16 establishes that an instruction such as CALJIC 17.41.1 violates an existing constitutional right."

17    Brewer controls in the instant case, particularly in light of petitioner's failure to

18 make any concrete assertion that the verdicts herein where adversely affected by the trial court's

19 instruction pursuant to CALJIC 17.41.1.  On the contrary, the objective evidence suggests no

20

21    [31]  In support of this argument, petitioner cites Fed. R. Evid. 1150 (" No evidence is
     admissible to show the effect of such statement, conduct, condition, or event upon a juror either
22    in influencing him to assent to or dissent from the verdict or concerning the mental processes by
     which it was determined").

23    [32]  The Court of Appeal stated (at p. 8 (original fn omitted)):

24    Perry claims the reading of CALJIC No. 17.41.1 deprived him of the right to a
     ttrial by jury, as contemplated by the Sixth Amendment to the Unite[d] States
25    Constitution.  The Supreme Court recently rejected this constitutional challenge to
     the instruction in People v. Engelman (2002) 28 Cal. 4th 436.  In accordance with
26    Engelman, we conclude the trial court did not err in reading CALJIC No. 17.41.1.

adverse impact:  the jury commenced deliberations at 11:20 a.m. on November 28, 2001, and
returned their verdict at 4:25 p.m. the same day, without any indication of deliberative
difficulties.  CT at 297, 298.  RT at 251, 255-260.  Accord, Crape v. Schwartz, 2006 WL
2169213 (E.D. Cal. 2006) (jury neither evidenced nor communicated any difficulties in the
deliberative process ); Tash v. Adams, 2006 WL 224431 (E.D.Cal. 2006) (nothing in record
indicated juror confusion, dissension, deadlock, refusal to deliberate or disregard the law);
Rucker v. Hamlet, 2007 WL 1176224 (E.D.Cal. 2007) (verdicts reached within a day and a half
with no indication of deadlock or holdout jurors).

The Court of Appeal's decision on this matter was therefore neither contrary to,
nor an unreasonable application of, clearly established federal law, nor did it constitute an
unreasonable determination of the facts.  28 U.S.C. § 2254(d)(1), (2).

Accordingly, petitioner is not entitled to relief based upon his claim he was denied
his Sixth Amendment right to a jury trial by the trial court's instruction pursuant to CALJIC No.
17. 41.1.

CONCLUSION

For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that
petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District
Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty
days after being served with these findings and recommendations, any party may file written
objections with the court and serve a copy on all parties.  Such a document should be captioned
"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections
shall be served and filed within ten days after service of the objections.  The parties are advised
\\\\\
\\\\\
\\\\\

1   that failure to file objections within the specified time may waive the right to appeal the District

2   Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3   DATED: 10/19/07

4                                                                /s/ Gregory G. Hollows

5                                                                GREGORY G. HOLLOWS
                                                                 UNITED STATES MAGISTRATE JUDGE

6

7   ggh5:Perry1681.hc

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26